HINES, Director General, et al. v. FIRST GUARANTY STATE BANK OF AUBREY. (No. 9544.)

(Court of Civil Appeals of Texas. Fort Worth. March 26, 1921. Rehearing Denied April 23, 1921.)

1. Carriers ⬤➡134—Evidence insufficient to show negligent delay on part of carrier.

In an action for damages to a shipment of meal, evidence *held* in view of war conditions insufficient to show negligent delay so as to render the carrier liable for its becoming heated.

2. Carriers ⬤➡120—Carrier held not liable for injury to meal shipped by reason of its inherent vice.

A carrier is not liable for injury to a shipment of meal because of the inherent vice of the article, which became heated merely as a result of transportation.

3. Carriers ⬤➡134—Evidence insufficient to show carrier's negligence in preserving heated meal after arrival at destination.

Evidence *held* insufficient to show negligence on the part of a carrier in preserving meal after it arrived at point of destination in a heated condition, but, on the contrary, to tend to show the utmost care on part of the carrier.

Buck, J., dissenting in part.

Appeal from Dist. Court, Denton County; C. R. Pearman, Judge.

Action by the First Guaranty State Bank of Aubrey against Walker D. Hines, Director General of Railroads, and others. From judgment for plaintiff, defendant Hines appeals. Reversed and remanded.

Garnett & Garnett, of Gainesville, for appellants.

Sullivan, Speer & Minor, of Denton, for appellee.

BUCK, J. This suit was brought by the First Guaranty State Bank of Aubrey, Tex., hereinafter called the Bank of Aubrey, against Walker D. Hines, Director General of Railroads of the United States of America, the Missouri, Kansas & Texas Railway of Texas, and C. E. Schaff, receiver of the Missouri, Kansas & Texas Railway Company of Texas, and the Texas & New Orleans Railway Company to recover $2,700 and interest, by reason of the alleged conversion of a car of cornmeal shipped from Aubrey, Tex., on March 11, 1918, by the Aubrey Milling Company to Nacogdoches, Tex., under a shipper's order bill of lading, notify W. T. Wilson

Grain Company. The cause was tried before a jury on special issues, which resulted in a judgment in appellee's favor for $3,020, with 6 per cent. interest from April 8, 1920, from which judgment the defendant, Walker D. Hines, as Agent, has appealed.

During the course of the trial, the defendant Walker D. Hines suggested to the court that at the time of the institution of the suit he was Director General of Railroads of the United States, but that by the Transportation Act passed by the Congress of the United States, and approved February 28, 1920 (41 Stat. 456) he, by the terms of said act, ceased to be Director General of Railroads, but that subsequently to the passage of said act, on, to wit, March 11, 1920, the President of the United States appointed said Hines as "Agent," under and by virtue of section 206 of said act. The judgment was rendered against Walker D. Hines, Director General, as said Agent.

The following special issues, in substance, were answered by the jury:

(1) That the plaintiff bank, on or about March 11, 1918, purchased of the Aubrey Milling Company the draft drawn on the W. T. Wilson Grain Company, with bill of lading attached, covering a shipment of 1,800 sacks of cornmeal, shipped by the Aubrey Milling Company to W. T. Wilson Grain Company at Nacogdoches, Tex., under shipper's order.

(2) That when the car of cornmeal reached its point of destination it was released to the W. T. Wilson Grain Company without payment of the draft and the surrender of the bill of lading, and that the bank of Aubrey did not agree or consent to such release and surrender of bill of lading.

(3) That the defendant was negligent in the transportation of the car of meal from Aubrey to Nacogdoches.

(4) That said negligence of defendant caused damages to the plaintiff.

(5) That the reasonable market value of the meal shipped at its destination was $1.50 per sack.

(6) That said meal was not inferior and of less value than that which the Aubrey Milling Company had contracted to sell and ship to said Grain Company.

(7) That the heated condition of the meal when it reached Nacogdoches was caused by the "germinating season."

(8) That the transportation of the shipment from Aubrey to Nacogdoches was not within the usual and customary time for such shipments.

(9) That plaintiff did not have noticed or knowledge of the arrangement by the Aubrey Milling Company with the W. T. Wilson Grain Company for the latter company to receive, care for, and dispose of the meal contained in the car for the account of the Aubrey Milling Company prior to May 29, 1918.

(10) That plaintiff did not approve of or ratify such arrangement.

(11) That at the time said meal was released to W. T. Wilson Grain Company it was of the value of $2 per hundred.

(12) That when it was reloaded for reshipment to Aubrey on June 26, 1918, it was of the value of $2.50 per hundred.

(13) That the Aubrey Milling Company would have received said meal if it had been forwarded by the defendant Walker D. Hines, to Aubrey from Nacogdoches, on June 26, 1918.

(14) That the Bank of Aubrey was not guilty of negligence in failing to notify the defendant or his agent prior to May 29, 1918, that it owned the shipper's order bill of lading, dated March 11, 1918, and the draft attached thereto.

(15) That, considering the condition of the meal and car when it reached Nacogdoches on March 19, 1918, it was necessary for the preservation of said meal that it should be unloaded and spread in a warehouse.

(16) That plaintiff purchased a second draft for $2,700 drawn by the Aubrey Milling Company on W. T. Wilson Grain Company, dated May 28, 1918, and that plaintiff then had no notice or knowledge that the car had been released to the Grain Company by the Aubrey Milling Company.

(17) That the plaintiff bank suffered loss on account of delivery of said meal to the Grain Company without the surrender of bill of lading.

(18) That the plaintiff bank did not have any notice of the nature of the contract between the Aubrey Milling Company and the Wilson Grain Company, and of the kind and quality of the meal to be shipped prior to the delivery of the car to the Grain Company.

The jury failed to answer the interrogatory as to whether or not a reasonably prudent and careful man, in the exercise of ordinary care, and having only the information possessed by agent of the railway company at Nacogdoches, would have delivered the car to the grain company on the order of the Aubrey Milling Company.

The evidence shows the following facts uncontradicted, except as indicated: That the Aubrey Milling Company was a customer of the Bank of Aubrey early in 1918, and that said milling company was a partnership composed of P. J. Henderson and J. A. Rhodes. That J. A. Rhodes was the father-in-law of A. Q. Mustain, cashier of the bank, and that Mustain lived about two or three blocks from Rhodes, and visited in his home frequently, and that Rhodes, Mustain, and Henderson lived in Aubrey during 1918. That Rhodes was a stockholder in the Bank

of Aubrey. That the Aubrey Milling Company had been a corporation, but that prior to 1918 the corporation had been dissolved, and the partnership formed. That during its existence as a corporation G. E. Light, P. J. Henderson, J. M. Henderson, Tom Rodgers, and S. C. Henderson were stockholders. That S. C. Henderson, brother of P. J. Henderson, was elected president of the bank of Aubrey some time in 1914, and continued as president or vice president up to and including 1918. That Mr. Rodgers was one of the owners of the Aubrey Milling Company when it was a corporation, and a stockholder and director in the Bank of Aubrey, and president of the Denison Bank & Trust Company, through which bank the draft for $2,700 was sent to the Nacogdoches bank for collection. That the directors of the Bank of Aubrey met each month, and oftener upon call of the cashier. That the local agent of the Missouri, Kansas & Texas Railway Company and the Texas & Pacific Railway Company at Aubrey, A. C. Bryant, was in the Bank of Aubrey almost daily, and that during the period from March 11 to June 26, 1918, he saw P. J. Henderson almost daily, and J. A. Rhodes less frequently. That the car containing the meal was loaded, and left Aubrey March 11th. That the distance from Aubrey to Nacogdoches, including the interchange at Dallas, is approximately 250 miles; that the usual running time of freight trains on these two roads is from 12 to 15 miles an hour. Defendant's witnesses testified, without direct contradiction, that, owing to the war conditions existing at that time and of the requirement of the United States government for the railroads to give preference to the shipment of war materials, soldiers, etc., 10 days was the usual time for a shipment to be made from Aubrey to Nacogdoches.

The evidence further shows: That on arrival of the car from Nacogdoches the agent of the railway company informed F. R. Penman, president and general manager of the Wilson Grain Company, of its arrival. That upon examining the contents of the car, Penman discovered that the meal was in a heated condition, and in such condition was unfit for human consumption and for the purposes for which he had purchased it, and he told the agent he would not accept said meal on the contract between the Aubrey Milling Company and the Grain Company. That there was no indication that the meal had been rained on or had been exposed to the weather while in the car, that its heated condition was caused by the corn from which the meal was ground containing too much moisture. Thereupon Penman 'phoned the Aubrey Milling Company, and told them of the condition of the meal and of his refusal to accept it. The Milling Company asked if he would unload it and handle it for their account if they would release it, and Penman told them the Grain Company would. Thereupon the Aubrey Milling Company wired the agent of the railroad company at Nacogdoches to release the car to the Grain Company. The meal was then unloaded and placed in the Grain Company's warehouse, and great care was used in an effort to dry it so that it would be fit for human consumption. Mr. Penman testified that at no time while the meal was in his charge was it fit for human consumption. The draft for $2,700, payable to the Aubrey Milling Company, and sent to the bank at Nacogdoches with the bill of lading attached, was indorsed in blank by the payee, and there was nothing on the draft or the bill of lading to indicate that any other person or corporation owned the draft or bill of lading except the consignor, the Aubrey Milling Company. Another car of meal was shipped by the Aubrey Milling Company to the Wilson Grain Company and reached Nacogdoches about April 10th. The meal in this car, also, was in a heated condition, and the Grain Company refused to accept it, and it was released to the Grain Company without payment of the draft attached to the bill of lading, with the understanding that the Grain Company would handle it for the Aubrey Milling Company. Later a part of the second shipment was sold by the Grain Company to parties at Athens, Tex. On or about May 29, some one called the Wilson Grain Company by long distance from Aubrey, purporting to represent the Bank of Aubrey, and asked Mr. Penman about some meal he had there belonging to the Aubrey Milling Company. The party stated that Mr. Henderson, of the Aubrey Milling Company, had told the bank that Mr. Jeter, who it appears was the traveling representative of the Aubrey Milling Company, had reported that the Wilson Grain Company had sold all or part of that meal. Mr. Penman replied that Jeter was mistaken; that he had not sold any of the meal, in spite of his efforts to do so. That he had tried to sell it for hog feed, but had failed. The plaintiff denied that any one connected with the bank had had this phone conversation with Penman. On June 14, after various telegrams and letters had passed between the Aubrey Milling Company and the Wilson Grain Company, the Aubrey Milling Company wired the Grain Company to return the meal to them. Thereupon the Grain Company loaded on a car all of the meal received in the March 11th shipment, except perhaps a few sacks which were too badly spoiled for shipment, the balance of the car received in April, and consigned said car to the Aubrey Milling Company. On June 27th, the Railway Company wired the Bank of Aubrey the following message:

"Understand you hold bill of lading for MK&T 84445 consigned to shipper's order W. T. Wilson Grain Company, shipper Aubrey Milling Company. This meal now at Nacogdoches, being held refused on account of damage condition. Advise quick what disposition shall be made of it. Rush action must be had."

In reply the plaintiff wired the railroad company as follows:

"We have wire from your agent advising car MK&T 84445 delivered March 20th without our authority and bill of lading. We hold MK&T for all damages, costs and expense amounting at this time to about $3,000."

Defendant also received a wire on June 28th from the Aubrey Milling Company as follows:

"Your wire we have advice from your agent Nacogdoches this car delivered March 20th. We have no further interest in the shipment."

After several telegrams had been exchanged between J. D. McCraney, freight claim agent of the Texas & New Orleans Railroad Company, and the Bank of Aubrey, the bank insisting on payment of the draft, with all damages, and the Railroad Company advising the bank that unless they had contrary orders from the bank the meal would be sold for charges, the meal was sold, after advertisement, to the railroad for $100. Subsequently the meal was sold to the Gulf Grain Company for $912.56. The railroad deducted from this amount $72.46 for expenses, consisting of demurrage, costs of advertising, the cost of working the meal over and placing it in a salable condition, and the expenses of making said sale, leaving a balance of $840.-10, which the defendant tendered in his pleadings. In September, 1918, the Aubrey Milling Company failed. On February 3, 1919, this suit was filed.

[1, 2] Under various assignments, the appellant has attacked the submission of the issue to the jury of whether or not defendant was negligent in the transportation of the car of meal from Aubrey to Nacogdoches, and the answer to the jury thereto that it was, and that such negligence caused the damage to the meal, etc. The majority of the court are of the opinion that the assignments, attacking the findings of the jury upon these issues, are well taken, and that the record, as a whole, fails to sufficiently disclose any act of negligence on the part of the defendant in the transportation of the car in question, or, if so, that such negligence was the proximate cause of the loss. The only witnesses who testified as to what was the usual and customary time for the transportation of the car from Aubrey to Nacogdoches, under the war conditions then existing, state that 10 days would be good time. It is true that some of the witnesses testify that the usual and customary running time of such shipments is from 12 to 15 miles an

hour, but such testimony does not take into consideration the fact of the war conditions then existing, and the preference given by the government to government shipments, and the further facts of the time necessary for the transfer from one railroad company to another at Dallas, and the delay necessary at Jacksonville, the division point, and the fact that, this being a single car, it could not reasonably be expected that it would make a continuous passage, but would have to wait at Dallas and the division points for trains running towards and to the point of destination. The majority are of the opinion that any damage to the shipment was due to the inherent vice or nature of the meal shipped. It is well established by all authorities that a railroad is not liable for injuries resulting from the inherent nature or vice of the thing shipped. G., S. & S. F. Ry. Co. v. Levi, 76 Tex. 337, 13 S. W. 191, 8 L. R. A. 323, 18 Am. St. Rep. 45; G., C. & S. F. Ry. Co. v. Ellison, 70 Tex. 491, 7 S. W. 785; Ft. Worth & D. C. Ry. Co. v. Berry, 170 S. W. 125, and cases there cited.

[3] The majority are of the opinion that the record fails to sufficiently disclose negligence on the part of the defendant, but, on the contrary, tends to show the utmost care practiced by the railroad company at Nacogdoches in an effort to preserve, as far as possible, the shipment of the meal, which on its arrival was shown to be in a heated condition and rapidly deteriorating. That even though there may be some evidence which, in a remote way, tends to show negligence, such evidence, in the opinion of the majority, is insufficient to warrant an affirmance.

Appellant's 13th assignment complains of the action of the court in rendering judgment for the amount of the draft, and insists that in no event should a judgment have been rendered in an amount in excess of that tendered. The majority conclude that under the record now presented the plaintiff is not entitled to recover more than $840.10, the amount tendered.

The writer, while being of the opinion that the evidence is not strong and cogent to show negligence on the part of the railway companies in the transportation of the car of meal, yet, with the evidence before the jury that the usual and customary running time was from 12 to 15 miles an hour, and the distance from Aubrey to Nacogdoches only 250 miles, and in the absence of affirmative proof by the defendant that in the transportation of the car no unnecessary delays took place, believes that the jury were authorized to find that 8 days constituted an unreasonable time for such shipment, and that the railway companies were negligent. It is further in evidence that even at the time of the year when this shipment was made, the so-called "germinating season," a shipment of meal of the character that plaintiff's testimony

tends to show that this was would have kept sweet, if shut up in a closed car, for 5 or 6 days. Hence the writer is unable to hold that as a matter of law the plaintiff's evidence was not sufficient to sustain the allegations of negligence in the transportation. It is too well established to justify citation of authorities that an appellate court should not reverse a judgment where the evidence is contradictory, and is reasonably sufficient to sustain such judgment. But the majority do not believe that the evidence presents such a conflict, and, in accordance with their conclusions, the judgment below will be reversed, and the cause remanded; and it is so ordered.

BUCK, J., dissenting.